**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **LISA MORGAN and EDWARD MORGAN,** | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 17-1013** |
| | : | |
| **ALMARS OUTBOARDS, INC.,** | : | |
| **Defendant.** | : | |

**McHUGH, J.**                                                                                             **June 13, 2018**
**MEMORANDUM**

This is a product liability case raising an important question of general maritime law: can an injured passenger recover punitive damages, and her spouse damages for loss of consortium, for non-fatal injuries suffered in coastal waters? Because of how maritime law has developed, partly by common law and partly by statute, the answers to these questions require close analysis. But in the wake of *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404 (2009), I am persuaded that such remedies are available to Plaintiffs. This is so because the claims they assert and the relief they seek are well established in general maritime law, and no act of Congress, including the Jones Act, eliminates their availability. *Townsend* held that when a common law cause of action and remedy predate a statute, courts need not ratchet down common law relief to match statutory relief, unless Congress has explicitly legislated otherwise. Consequently, I hold that such damages are recoverable by Plaintiffs in this case.

## I.   Factual Background

During a July 2014 outing on the water, Plaintiff Lisa Morgan's right pinkie and ring fingers were traumatically amputated in a boating accident. She was entering the water from the surface of a 2006 Bentley Pontoon Boat when her hand caught in the boat's gate. The only dispute as to how

the accident happened is over whether Ms. Morgan was jumping, stepping, or lowering herself into the water. Ms. Morgan's spouse, Edward Morgan, was on a nearby boat at the time, and rushed to her aid.

The relevant evidence in this case reaches back more than a decade to the original manufacture, sale, and recalls of the boat in question. The Bentley Pontoon boat on which Ms. Morgan was injured was owned by the Morgans' friend, Richard Spence. Spence bought the boat new in Delaware in early 2006 from Defendant Almars Outboards, Inc., an authorized dealer for Bentley, the boat's now-defunct manufacturer. There is no evidence in the record that Spence knew he was purchasing a boat with a dangerous design that had already been the subject of a safety recall and would soon be recalled again. Bentley designed its pontoon boats to have metal railings that curved down to the hinges where the railings met the gate. Bentley soon learned that this design created a "pinch point" where the curved corners of the gate and railing came together, allowing a passenger's fingers to become ensnared. On March 1, 2004, Bentley sent a Safety Recall notice to its dealers. It began:

> We have identified a safety risk associated with the design of our railings and gates. It is possible for a person's finger(s) to lodge between the points where a railing and gates meet on all of our models. The probability of this occurring seems greatest when entering into or exiting from the water. Possible injuries can range from laceration to dismemberment.

Pls.' Ex. G, ECF No. 47-1, at 36–38. In an effort to eliminate this hazard, Bentley developed a spherical guard that could be installed at the pinch point [hereinafter a "ball guard"]. Boat owners could choose to install the guards themselves or have a Bentley dealer do it, free of charge, with Bentley reimbursing dealers for their labor.

Unfortunately, these ball guards did not fix the problem, and the pinch point on Bentley boats continued to injure passengers. On January 1, 2007, Bentley issued a second Safety Recall letter to its dealers. This second notice was much like the first, but added that the ball guards, in

addition to the railings, were unsafe. The notice urged dealers to immediately install new "gate replacement corner flat kits" [hereinafter "block guards"] and to encourage customers to have the guards installed "before the next use of their boat." The letter warned: "This is very important and we do not want any further injures. Act Immediately." Pls.' Ex. L, at 93. In addition to these notices, there were several well-documented instances of finger injury and amputation on Bentley boats, and there is evidence that at least one Bentley dealer notified its customers of the danger and provided an effective guard well before either recall notice.

Almars contends that it had no knowledge of the safety hazard that Bentley's gates or ball guards posed until it learned of Ms. Morgan's injury. The owner of Almars, Albert Marinelli, testified that Almars sold Bentley boats for about two years, from 2004 to September 2006. He testified that, despite Almars's status as an authorized Bentley dealer that performed repairs under Bentley's warranty, Almars never received the 2004 or 2007 safety recall notices, and never heard of any customer or anyone else being injured by the gate. Marinelli took this position in spite of his testimony that a Bentley sales representative (Ed Butcher) regularly visited Almars, and that, on one occasion, Butcher "dropped a bunch of those balls on our desk and said if any boats come in without these, put them on." Marinelli Dep. 116:17–23, Pls.' Ex. I, at 45. But the boats Almars bought from Bentley came equipped with the ball guards already, so Marinelli never used the guards and "never really paid much attention" to them. *Id.* at 117:17–23. The boat Spence bought from Almars in January 2006 arrived from Bentley to Almars equipped with these (ineffective) ball guards, which were in place at the time of Ms. Morgan's accident.

## II. Procedural Posture

Based on these events, Plaintiffs filed this products liability lawsuit, which the parties agree

is governed by general maritime law.[1]  Plaintiffs sued only Almars as the retail supplier of the product.  Ms. Morgan makes claims based in negligence and two theories of strict liability—sale of a defective product and failure to warn—seeking punitive damages and other remedies. Compl. ¶¶ 22–29, ECF No. 1.  Mr. Morgan asserts a derivative claim of loss of consortium based on the injuries Ms. Morgan suffered, and an independent claim for negligent infliction of emotional distress (NIED) based on his proximity to the accident. Compl. ¶¶ 18–21.

The parties have filed cross motions for partial summary judgment. Pls.' Mot. Summ. J., ECF No. 47 [hereinafter "Pls.' Mot."]; Def.'s Mot. Partial Summ. J., ECF No. 49 [hereinafter "Def.'s Mot."].  Plaintiffs seek summary judgment against Almars on both of their theories of strict product liability. Pl.'s Mot. 12–19.  Defendant seeks dismissal on the merits of the Morgans' negligence and NIED causes of action, and asserts that their claims for punitive damages and loss of consortium must be dismissed as unavailable under general maritime law. Def.'s Mot. 10–18.  Alternatively, Almars seeks dismissal of the punitive damages claim on the merits. *Id.* at 16.

For the reasons that follow, and as set forth in my Order of May 4, 2018, both Motions are granted in part and denied in part. ECF No. 58.  The Morgans are entitled to summary judgment on the issue of whether Almars supplied a "defective" product that was "unreasonably dangerous," as those terms are defined in Section 402A of the Restatement (Second) of Torts, when it originally sold the pontoon boat on which Ms. Morgan was injured—there is no dispute that it did.  The remainder of Plaintiffs' Motion is denied, however, as those issues, including liability for failure to warn and causation, are appropriate for resolution by a jury.  Almars's Motion is granted only as to Mr. Morgan's NIED claim, to which there is no opposition.  It is denied as to the merits of Ms. Morgan's negligence claim, and as to the availability of her claim for punitive damages and Mr. Morgan's claim for loss of consortium, because the Morgans may access those remedies under

---

[1] General maritime law is how courts frequently refer to federal maritime common law. David Robertson, *Punitive Damages in U.S. Maritime Law: Miles, Baker, and Townsend*, 70 Louisiana L. Rev. 463, 476 n.87 (2010).

general maritime law.  Finally, Defendant's Motion is denied as to the merits of Ms. Morgan's

punitive damages claim.

## III.  Standard

The parties' motions are governed by the well-established standard for summary judgment

set forth in Federal Rule Civil Procedure 56(a), as amplified by *Celotex Corporation v. Catrett*, 477

U.S. 317 (1986).

## IV.  Discussion

### A.  Ms. Morgan's Motion for Judgement in her favor on Strict Liability

Preliminarily, it should be observed that it is rare for a party that bears the burden of proof to

prevail by summary judgment. *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990).  Plaintiff

can prevail in part because she is proceeding under a theory of strict liability and the essential facts

are not in dispute.

It is clearly established that the Restatement of Torts' strict liability principles, which form

the basis for Ms. Morgan's claims, apply to general maritime actions like this one.  *Ocean Barge*

*Transp. Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 123 (3d Cir. 1984).  The parties agree

on this point. Pls.' Mot. 14–18; Def.'s Resp. 16, ECF No. 52.  Her first claim rests on Section 402A,

which creates liability for the seller of a product in a "defective" condition that is "unreasonably

dangerous":

> (1) One who sells any product in a defective condition unreasonably dangerous . . . is
> subject to liability for physical harm thereby caused to the ultimate user or consumer,
> or to his property, if
> > (a) the seller is engaged in the business of selling such a product, and
> > (b) it is expected to and does reach the user or consumer without substantial
> > change in the condition in which it is sold.

Restatement (Second) of Torts § 402A (1965).[2]  To prevail on this theory, Ms. Morgan must

---

[2] The parties invoke the Second Restatement framework for strict liability.  The Third Restatement has modified
the doctrine to some extent.  *See* Restatement (Third) of Torts:  Prod. Liab. § 1 (1998).  I am proceeding with my

establish that (1) the pontoon boat was defective; (2) the defect was a proximate cause of her injury; and (3) the defect existed at the time the boat left Almars's hands. *See Pavlik v. Lane Ltd./Tobacco Exporters Int'l*, 135 F.3d 876, 881 (3d Cir. 1998). There is no dispute that Bentley was the designer and manufacturer of the boat involved here and that, as its originator, Bentley concluded that the boat was defective and, later, that the ball guards were defective. Almars did not, undoubtedly because it could not, proffer an expert opinion from an engineer or design professional contesting the danger of the design. Both logic and common sense supports the conclusion that a recreational craft used for the pursuit of leisure cannot have a readily accessible pinch point. And this danger, which Bentley identified and inadequately sought to design around or warn against, fits exactly the harm suffered by Ms. Morgan. It is likewise undisputed that Almars was engaged in the business of selling Bentley pontoon boats, and that when it sold the boat on which Ms. Morgan was injured, the boat had a defective gate hinge (with an ineffective ball guard) that was unreasonably dangerous in that it created a risk of finger amputation. There is similarly no dispute that the boat was expected to and did reach Ms. Morgan without a substantial change in the condition in which it was sold.

Section 402A goes on to provide that "[s]ubsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product." For that reason, Almars's contention that it was unaware of the defect and unaware of the danger does not suffice to prevent it from being held liable as a matter of law. Indeed, the essence of strict liability is that a supplier is the guarantor of its product's safety regardless of fault. Therefore, as to the issue of whether Almars supplied a defective product, summary judgment is granted.

---

analysis under the Second Restatement because the parties advance it as the controlling standard; the Third Restatement has not been universally embraced by the courts, *see, e.g.*, *Tincher v. Omega Flex, Inc.*, 628 Pa. 296, 309, 104 A.3d 328, 335 (2014); federal appellate courts have yet to adopt the Third Restatement as the standard for maritime law, *see* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-7 (5th ed. 2012) (updated Nov. 2017) ("The applicable substantive law of products liability in admiralty is Section 402a of the Restatement (Second) of Torts (1965) . . . .") (as cited in *Williams v. Coleman Co., Inc.*, 2016 WL 3166250, at *2 (N.D. Ala. 2016)); and finally, I am confident that the modifications embodied in the Third Restatement would not relieve Almars of strict liability on the record here.

Almars specifically disputes causation, and whether the defective gate hinge was a proximate cause of Plaintiff's injury. I am hard pressed to see any *material* disputes, as the details of how Ms. Morgan's hand came into contact with the pinch point would seem irrelevant to the danger it presented. Nonetheless, out of an abundance of caution, I will leave that issue for resolution by the jury.[3]

Plaintiffs' second strict liability theory is failure to warn.[4] Plaintiffs assert that Almars should have known of the risk posed by the defective gate and ineffective ball guards, and should have provided Spence with a post-sale warning of the danger so that he could warn his guests, including Ms. Morgan, or fix the problem. Pls.' Mot. 18–19. There is undisputed evidence that Almars knew that ball guards should be installed on the gates, but whether Almars knew or should have known the ball guards were ineffective remains in dispute. *See* Marinelli Dep. 115:3–118:3, Pls.' Ex. I, at 45. One aspect of this issue is whether Almars received the Bentley safety recall letters in 2004 and/or 2007 warning of dismemberment from the defective hinges and, later, ball guards. *See* Pls.' Exs. G, at 35; Pls.' Ex. L, at 92.[5] Accordingly, Plaintiff's Motion is denied as to failure to warn.

## B. Defendant's Motion as to Mr. Morgan's Negligence Claim

In negligence claims under general maritime law, plaintiffs must generally prove the same elements as traditional common law: duty, breach, causation, and damages. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010). The same evidence that supports strict liability would allow a jury to find negligence. Defendant's Motion is therefore denied.

---

[3] Almars also raises the issue of whether Ms. Morgan contributed to her own injuries. Whether that is legally relevant under the governing liability standard will require further discussion at trial.

[4] Without explanation, Plaintiffs advance Section 10 of the Third Restatement in presenting their failure to warn claim. I am not inclined to presume its applicability for the reasons set forth above, but there is no need to resolve that issue, as summary judgment as to this claim is unwarranted under either version of the Restatement.

[5] There is no dispute, however, that Almars knew Spence purchased a Bentley boat and had Spence's contact information. *See* Almars Boat Sale Records, Pls.' Ex. K, at 75.

C.  Defendant's Motion as to Mr. Morgan's NIED Claim

The parties agree that general maritime law applies the "zone of danger" test to NIED claims and that Mr. Morgan's NIED claim does not meet that test because he was "not personally placed in immediate risk of physical harm" as a result of the accident. *See* Defs.' Mot. 16–17 (citing *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1338 (11th Cir. 2012)); Pl.'s Resp. 19, ECF No. 51. Mr. Morgan's NIED is accordingly dismissed.

D.  Availability of Punitive Damages and Loss of Consortium

Before addressing the heart of the parties' dispute over whether punitive damages and loss of consortium are available to Plaintiffs, I first review some basic concepts in maritime law. Federal maritime jurisdiction derives from the United States Constitution, art. III, § 2, and is codified at 28 U.S.C. § 1333, which states:  "The district courts shall have original jurisdiction, exclusive of the courts of the States, of (1) [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled. . . ."  The scope of maritime jurisdiction may be straightforward, but the controlling substantive law can vary based on whether the plaintiff is a seaman,[6] a longshoreman, harbor worker, or, like Ms. Morgan, a passenger aboard a vessel.  Maritime law also attaches significance to whether the injury occurred in coastal waters or on the "high seas" (beyond territorial waters).  These are not mutually exclusive, and seamen often proceed on more than one basis. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009).

Maritime law is a centuries-old, evolving area of federal common law that Congress has more recently supplemented with statutory protections. *See id.* at 416.  Although Plaintiffs' claims arise under general maritime law, some background about the statutory relief available to people

---

[6] The law continues to refer to mariners as "seamen," although men and women alike now work aboard ships.  I nevertheless use the archaic term since this case, brought by a passenger, is not an ideal vessel for its much-needed modernization.

injured at sea is necessary context to determine whether Plaintiffs' common law remedies here are affected by any legislation. In the first instance, federal common law historically provided causes of action for seamen based on negligence, a vessel's unseaworthiness, and a violation of the employer's "maintenance and cure" obligation—that is, to provide for the living expenses and medical costs of an injured seaman. *See Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938). In 1920, Congress passed the Jones Act, 46 U.S.C. §§ 30101–30106, originally the Merchant Marine Act, 46 U.S.C. § 688, "for the benefit and protection of seamen[,] . . . the wards of admiralty." *The Arizona v. Anelich*, 298 U.S. 110, 123 (1936).[7] As discussed more fully below, it is significant that as originally passed, and for decades thereafter, the Jones Act covered only seamen, who were also employees. It was not until 2006 that Congress amended the Jones Act to create, for the first time, a statutory cause of action for passengers injured as a result of negligence. §§ 30102–30103. A different Jones Act provision, governing "[p]ersonal injury to or death of seamen," § 30104, incorporates the Federal Employers' Liability Act (FELA), aligning maritime employees' statutory tort recovery with that of interstate railroad workers. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 29 (1990) (citing FELA, 45 U.S.C. § 59). FELA, in turn, limits recovery to pecuniary damages, thereby excluding punitive damages and loss of consortium. *See id.* Consequently, much of the case law applying the Jones Act was affected by a statute specifically designed to address the claims of injured workers. An understanding of this historical context is necessary in addressing the development of the law that should govern this case.

    1. <u>Damages under General Maritime Law</u>

        Defendant's Motion raises two questions: whether a plaintiff passenger in a general maritime law negligence claim may recover punitive damages, and whether her spouse may recover

---

[7] The seaman has been "singled out by the Congress . . . as one of a class of workers requiring special consideration and treatment, [as] he has long been regarded in admiralty as . . . incapable of protecting his rights." Martin J. Norris, *The Seaman as Ward of the Admiralty*, 52 Michigan L. Rev. 479 (1954).

for loss of consortium.[8]  Almars argues that *Miles v. Apex Marine*, 498 U.S. 19 (1990), controls

both questions. Defs. Mot. 14–15.  In *Miles*, the Supreme Court first extended the federal common

law wrongful death cause of action, already available to survivors of longshoremen, to survivors of

"true seamen" killed as a result of a vessel's unseaworthiness while in port (and thus within coastal

waters and not on the high seas). 498 U.S. at 32–33.  The Court then concluded that the damages

available under this newly-recognized common law claim, like those available under its statutory

equivalent, should not include loss of society.  The Court reasoned that both holdings brought

maritime common law into uniformity with the protections previously created by Congress in the

Jones Act (incorporating FELA) and the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 761–

762, which already provided for wrongful death actions for seamen's survivors and explicitly

excluded loss of society. *Miles,* 498 U.S. at 29–30.

Defendant urges me to extend *Miles* to limit the Morgans' recovery.  Its position is based

upon a questionable analogy, requiring several analytical leaps:

> from *Miles*, where (1) survivors of a seaman (2) covered by the Jones Act and FELA (and who would have been covered by DOHSA had his death been on the high seas), brought a (3) wrongful death claim (4) for unseaworthiness and (5) was denied loss of consortium,

> to Ms. Morgan, (1) a passenger (2) not covered by the Jones Act's rules for seamen, FELA, or DOHSA, who brings a (3) personal injury claim (4) based on negligence and (5) seeks punitive damages and, in the case of Mr. Morgan, loss of consortium.

In support of this interpretation, Defendants rely exclusively on non-binding cases that discuss the

rights of seamen under the Jones Act, FELA, and DOHSA, all decided before *Townsend*, and cite

only one case from this district. *See* Defs.' Mot. 14–15 (citing *Watson v. Oceaneering Int'l, Inc.*,

387 F. Supp. 2d 385, 391 n.4 (D. Del. 2005)) (dismissing common law claims by a Jones Act

seaman and his spouse and stating in dicta that some courts had read *Miles* to preclude loss of

---

[8] Throughout this opinion, loss of consortium is used interchangeably with "loss of society" and "loss of services." *See* 22 Am. Jur. 2d Damages § 246  ("A spouse can recover for loss of consortium, including loss of society, sex, service, and support . . . .").

consortium for common law personal injury claims by seamen). As explained below, several of the inferences required by Defendant's analogy lack a sound foundation, and fail to account for how the Supreme Court limited *Miles* when it issued *Townsend*. *See Townsend*, 557 U.S. at 407.

Plaintiffs, for their part, contend that *Townsend* governs both issues—the availability of punitive damages and of loss of consortium. *Id*. *Townsend* directly addressed the availability of punitive damages to general maritime law plaintiffs, and in the process set out a framework for determining how courts should reconcile the often-overlapping claims available under maritime common law and relevant statutes. *Townsend* explicitly limited the scope of *Miles*, and cautioned that lower courts had applied it too broadly, to the detriment of maritime plaintiffs. *See Barrette v. Jubilee Fisheries, Inc.*, 2011 WL 3516061, at *4 (W.D. Wash. 2011) (holding the same). Defendants, who acknowledged *Townsend* only after Plaintiffs raised it, argue it is not applicable to this case as it involved a different maritime common law cause of action and did not overrule *Miles*, but I am persuaded that *Townsend* provides the governing framework for the issues before me.

    **a.** *Townsend* **and** *Miles*

Because differing interpretations of *Townsend* (including its effect on *Miles*) form the crux of the parties' disagreement, I begin with a careful review of that case. Plaintiff Townsend was a seaman injured while working on a tugboat. 557 U.S. at 407. When the tugboat's owner refused to provide maintenance and cure, Townsend sued under general maritime law and the Jones Act asserting claims of negligence, unseaworthiness, and a willful failure to pay maintenance and cure. *Id.* at 408. Townsend sought punitive damages through his common law maintenance and cure claim. *Id.* at 407. Similar to Almars, the tugboat defendants argued that, under *Miles*, seamen who brought common law claims were limited to the damages available under the Jones Act, which did not include punitive damages. *Id.* at 408. The Court cast aside this argument, holding that (1) the relief Townsend sought (punitive damages) has historically been available and awarded in maritime

11

actions, "including some in maintenance and cure," and (2) "nothing in *Miles* or the Jones Act eliminates that availability." *Id.* at 407.

The Court thus outlined a two-step framework to apply where a plaintiff seeks relief under general maritime law in an area where Congress has also legislated: first, determine whether the claim and relief sought are well established (historically available) in general maritime law; second, determine whether any statute eliminates that availability. *See id.* at 407. To arrive at its first conclusion—that seamen plaintiffs in maintenance and cure common law claims had historically been entitled to punitive damages—the *Townsend* Court identified three "settled legal principles." First, it found that American courts have allowed punitive damages awards since at least 1784, and that the Supreme Court has likewise authorized punitive damages "as a matter of common law doctrine." *Id.* at 410 (citing cases from 1859 and 1886). Second, it found that "the general rule that punitive damages were available at common law extended to claims arising under federal maritime law." *Id.* at 411–12 ("[P]rior to enactment of the Jones Act in 1920, maritime jurisprudence was replete with judicial statements approving punitive damages, especially on behalf of passengers and seamen."). Third, the *Townsend* Court found that "[n]othing in maritime law undermines the applicability of this general rule in the maintenance and cure context." *Id.* In sum, because "pre-Jones Act evidence indicates that punitive damages remained available," the Court held that Townsend could pursue punitive damages "unless Congress enacted legislation departing from this common law understanding." *Id.* at 415.

In its second step, the *Townsend* Court concluded that Congress had not prescribed any such limitation. It explained that "[t]he only statute that could serve as a basis for overturning the common law rule in this case is the Jones Act." Reviewing the Act's origins, the Court noted that it was passed to *expand* recovery available to seamen—specifically, to overrule a 1903 case in which the Supreme Court had barred a seaman or his family from recovering for injuries or death caused

by his employer's negligence. *Id.* at 415 (citing *The Osceola*, 189 U.S. 158). The Court also examined the language of the Jones Act, and concluded that the fact that an injured seaman "may elect" to bring a Jones Act claim indicated "a choice of actions for seamen—not an exclusive remedy." *Id.* at 416 (citing 46 U.S.C. § 30104).

Even though nothing on the face of the Jones Act undermined Townsend's common law right of action, the tugboat defendants argued that the absence of a punitive damages remedy in the Act should nevertheless prohibit the recoverability of punitive damages under the logic of *Miles. Id.* at 418. The tugboat defendants claimed, just as Almars does here, that *Miles* should be construed as having "limited recovery in maritime cases involving death or personal injury to the remedies available [to seamen] under the Jones Act and [DOHSA]." *See id.* But the *Townsend* Court rejected that position as "far too broad" because *Miles* dealt with "an entirely different question." *Id.* at 419. The *Miles* Court faced a general maritime law that was narrower than newer, corresponding statutory protections, and ultimately expanded general maritime law "to harmonize it with a cause of action created by statute." *Townsend,* 557 U.S. at 419. In doing so, the *Miles* Court adopted Congress's "legislative judgment," recognizing a general maritime law wrongful death action for the first time. *Id.* But because Congress had also chosen to limit recovery to exclude loss of consortium, the *Miles* Court did the same. Thus, *Miles* expanded maritime common law to match— but not exceed—rights and relief created by statute.

*Townsend* recognized that the *Miles* approach was uniquely a function of the fact that the Court there was deciding whether to expand a judicially-created rule to conform to the scope of an existing, more protective statutory rule. *Id.* at 420. *Townsend* emphasized that it was the original legal foundation for the claims asserted that distinguished *Miles*, noting that "it was only because of congressional action" that the cause of action in *Miles* existed, whereas the common law action and remedy at issue in *Townsend* pre-dated any statute: "Unlike the situation presented in *Miles*, both

13

the general maritime cause of action (maintenance and cure) and the remedy (punitive damages) were well established before the passage of the Jones Act." *Id.* at 420–21.  It follows that when a common law cause of action and remedy predate a statutory equivalent, courts need not ratchet down common law relief to match statutory relief, unless Congress has explicitly legislated otherwise. *See* 557  U.S. at 420–21, 424 (punitive damages in maintenance and cure actions, which pre-date the Jones Act, are "entirely faithful to the general principles of maritime tort law" and no statute—including the Jones Act's prohibition on punitive damages for seamen—"casts doubt on their availability under general maritime law").[9]

*Townsend* made clear that simply because the Jones Act provides a remedy for a given cause of action "does not mean that the Jones Act provides the only remedy," explaining that "[t]he laudable quest for uniformity in admiralty does not require the narrowing of available damages to the lowest common denominator approved by Congress for distinct causes of action." *Id.* at 422–24.[10]  The Court thus concluded the second step of its analysis, holding that neither the Jones Act nor *Miles* displaced Townsend's common law claim or the relief he sought.

As discussed in more detail below, the Morgans assert claims and seek relief based in long-standing general maritime law.  The relevant Jones Act provision (the 2006 amendment adding a negligence action for passengers), did not reach beyond common law—rather, it codified existing general maritime law.  Therefore, *Townsend*, not *Miles*, governs this case.

I find no merit to Defendants' suggestion that *Townsend* is "not applicable" here by virtue of

_____

[9] Lest any doubt remain, *Townsend* explicitly rejected the argument Almars now makes, stating:  "[The] contention that *Miles* precludes any action or remedy for personal injury beyond that made available under the Jones Act was directly rejected by this Court in *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818 (2001)." 557  U.S. at 421 (citing a case for wrongful death of a harborworker where the Court noted that "general maritime law has recognized the tort of negligence for more than a century" and holding that "Congress's occupation of this field is not yet so extensive as to preclude us from recognizing what is already logically compelled by our precedents.").

[10] The Court added that overlapping liability under the Jones Act and common law is significant "only in that it requires admiralty courts to ensure against double recovery." *Id.* at 423 n.10.

the fact that Ms. Morgan asserts different general maritime claims—negligence and strict liability instead of maintenance and cure. *See* Def.'s Reply 6, ECF No. 56. *Townsend* is not rooted in maintenance and cure law. Rather, it addresses principles of general maritime law, as they apply to maintenance and cure claims. Indeed, the Court admitted (in the first step of its analysis) that "the handful of early cases involving maintenance and cure, by themselves, do not definitely resolve the question of punitive damages availability in such cases." 557 U.S. at 415 n.4. But "the general common-law rule made punitive damages available in maritime actions," and the Court found no reason "why maintenance and cure actions should be excepted from this general rule." *Id.* In fact, *Townsend* analogized to negligence actions in support of its conclusion that maintenance and cure actions were well established: "Like negligence, the general maritime law has recognized for more than a century the duty of maintenance and cure and the general availability of punitive damages." *Id.* at 422.

### b. *Townsend* Step 1: Relief historically available?

Here, *Townsend*'s explicit reliance on the history of general maritime negligence actions makes the first step of the *Townsend* analysis far simpler. This initial step asks whether Ms. Morgan's common law negligence action is well established (and pre-dates the Jones Act Amendment), and *Townsend* has definitively determined that it is (and does). *Id.* at 421–22 (citing *Garris*, 532 U.S. at 811). Although Ms. Morgan's strict products liability action is a relatively modern development in general maritime law, it was well established decades before the 2006 amendment. *See E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 865–66 (1986) ("[T]he question whether principles of strict products liability are part of maritime law is no longer seriously contested.").[11] *Townsend* likewise recognized the historical availability of punitive

---

[11] As Plaintiffs point out, the concept of liability without fault runs deep in maritime law, albeit under a different name. Pls.' Mot. 15. Unseaworthiness, one of maritime law's oldest causes of action, guarantees seamen "an absolute right to a seaworthy ship," without regard to the fault on the part of the owner. *See Kermarec v.*

damages in general maritime law, and in negligence actions specifically. *Id.* at 409–13, 421–22; *accord Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (upholding punitive damages in a maritime common law negligence action and noting that punitive damages "date back at least to 1763"); *see also Jurgensen v. Albin Marine, Inc.*, 214 F. Supp. 2d 504, 509 (D. Md. 2002) (confirming the availability of punitive damages in a products liability action by non-seamen based on a defectively designed boat).

The only remaining question in *Townsend*'s first step is whether loss of consortium is well established in general maritime law, and in negligence actions specifically. I conclude that it is, based on several old and modern cases showing that loss of consortium has been available to maritime plaintiffs since well before the Amendment and even the Jones Act itself. *See Cutting v. Seabury*, 6 F. Cas. 1083, 1084 (D. Mass. 1860) (holding that a father's loss of consortium claim "can be maintained" but denying it on other grounds); *New York & Long Branch Steamboat Co. v. Johnson*, 195 F. 740, 742 (3d Cir. 1912) (holding that loss of consortium is available in admiralty, and awarding $700—a $12,500 value today—to the husband of a passenger negligently injured in a boat accident); *see also Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 589 (1974) (recognizing a longshoreman's spouse's right to loss of consortium in a common law claim for wrongful death in territorial waters, and stating that, "since the 17th century, juries have assessed damages for loss of consortium . . . in civil actions brought by husbands whose wives have been negligently injured."); *Am. Exp. Lines, Inc. v. Alvez*, 446 U.S. 274, 281 (1980) (extending *Gaudet* to recognize loss of consortium claims by the wife of seaman non-fatally injured in territorial waters); *Barrette*, 2011 WL 3516061, at *4 (W.D. Wash. 2011) (in applying *Townsend*, finding "that loss of consortium damages have long been available at common law, and the common-law tradition allowing recovery

---

*Compagnie Gen. Transatl.*, 358 U.S. 625, 632 n.9 (1959). Moreover, Ms. Morgan's failure to warn theory, although nominally a strict liability claim, "is tested on grounds of reasonableness in view of the danger created, and [thus] . . . may be said to rest on negligence." Schoenbaum, *supra*, § 5-7.

for loss of consortium extends to general maritime claims).

In historical terms, the relatively small number of early maritime cases demonstrating the availability of loss of consortium can be attributed to a combination of the realities of life at sea and an American legal system that did not recognize the rights of women at the turn of the nineteenth century. Not surprisingly, most maritime cases involved seamen, who at the time truly were sea*men*, and the law did not allow female spouses to recover for loss of consortium on land or at sea. (In the two early cases cited above, it was men who sought loss of consortium for injuries to their child and wife, respectively.) Whereas "a husband's right to the consortium of his wife was clear and definite," there was "no clear authority" as to the corresponding rights of a wife and, even if one existed, a woman could not effectively exercise that right because "a married woman was incapable of suing except when her husband joined as plaintiff," and he "was entitled to the proceeds of any suit brought." Evans Holbrook, *The Change in the Meaning of Consortium*, 22 Michigan L. Rev. 1, 2–3 (1923) (citing Blackstone, 3 Bl. Comm. 142 (1765–1769)).[12]

Defendant has opted not to engage in a *Townsend* analysis, and thus fails to refute that loss of consortium was historically available under general maritime law, and in particular fails to come to grips with the Third Circuit's holding in *Long Branch Steamboat.* Instead, Almars cites to modern, pre-*Townsend* cases in which courts have rejected a spouse's claims for loss of consortium, some under the Jones Act and some under general maritime law. There is no need to address them individually, as I am convinced that *Townsend* governs the issue before me.

Accordingly, I am satisfied that claims for punitive damages and loss of consortium have historically been available and awarded in maritime actions, including in negligence and strict

_____

[12] Blackstone reflects the sentiments of that bygone era: "[I]n these relative injuries, notice is only taken of the wrong done to the superior of the parties" because "the inferior hath no kind of property in the company, care, or assistance of the superior . . . and therefore the inferior can suffer no loss." *Id.* In fact, in some jurisdictions, it took a constitutional challenge to secure the right of a wife to claim damages for injury to her husband. *See, e.g.*, *Hopkins v. Blanco,* 457 Pa. 90, 320 A.2d 139 (1974).

liability actions, and this fulfills the first step of the *Townsend* analysis.

### c. *Townsend* Step 2: Barred by the Jones Act?

*Townsend*'s second step requires a determination as to whether anything in the Jones Act or *Miles* eliminates the availability of such remedies. *See id*. I readily conclude that it does not. As noted above, the Jones Act was originally passed in 1920 to protect the rights of seamen. In 2006, Congress amended the Act, outlining causes of action for passengers injured by vessel owners' negligence. §§ 30102[13]–30103[14]. Nothing in the text of those provisions, or anywhere in the Act, suggests that Congress intended to displace passengers' well established general maritime law right to seek punitive damages and loss of consortium in a negligence action, and the Amendment makes no reference at all to product liability claims.

Looking beyond the text of the Act's passenger provision to the very few courts that have applied it likewise provides no suggestion of a limitation of traditional maritime remedies. The vast majority of cases applying the Jones Act arise in the employment context—in cases brought by seamen. *See, e.g.*, *Davila v. Erickson & Jensen Seafood Packers*, 2012 WL 4514666, at *2 (S.D. Tex. 2012); *Primozich v. Oczkewicz*, 2017 WL 77518, at *2 (W.D. Wash. 2017). The section relating to passenger liability, § 30102, has never been considered by the Third Circuit. In fact, a survey of district court decisions nationwide reveals only two references to § 30102, and neither includes any analysis. *See Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, 2013 WL

---

[13] (a) Liability. The owner and master of a vessel, and the vessel, are liable for personal injury to a passenger or damage to a passenger's baggage caused by--
    (1) a neglect or failure to comply with part B ["Inspection and Regulation of Vessels"] or F ["Manning of Vessels"] of subtitle II of this title; or
    (2) a known defect in the steaming apparatus or hull of the vessel.
 (b) Not subject to limitation.--A liability imposed under this section is not subject to limitation under chapter 305 of this title ["Exoneration and Limitation of Liability"].

[14] A person may bring a civil action against a master, mate, engineer, or pilot of a vessel, and recover damages, for personal injury or loss caused by the master's, mate's, engineer's, or pilot's--
    (1) negligence or willful misconduct; or
    (2) neglect or refusal to obey the laws governing the navigation of vessels.

1499046, at *9 (D.V.I. 2013) (passenger sought to proceed under § 30102 and, at summary judgment, the court decided to defer "until after trial its ultimate determination of whether § 30102 applie[d]"); *Puertas v. R J Diving Ventures, Inc.*, 2013 WL 12158055, at *2 (S.D. Fla. 2013) (noting that the plaintiff passenger had originally included a § 30102 claim in the complaint, but later dropped it).[15]

Even expanding the search to include § 30103, a section of the Jones Act that applies even more broadly to "persons," I have found only three cases by passengers nationwide: one that makes a passing reference to the section, though the plaintiff did not proceed on that basis, *Vandermeer v. M/V Charazz*, 2017 WL 4248045, at *2 (E.D.N.C. 2017); another that addresses an earlier version of § 30103, but, in which, "because there [was] not much case law interpreting this statute and its negligence standard," the court applied Iowa case law instead, *Dahl v. Lady Luck Bettendorf, L.C.*, 2001 WL 740472, at *3 (S.D. Iowa 2001); and a third that appears to cite § 30103 in error, because in fact it relies on § 30104, governing seamen, *Hornick v. Am. Commercial Barge Line*, 2008 WL 2168893, at *1 (W.D. Ky. 2008)). Thus, my own research reveals no case—and Defendant offers none—in which a court analyzing a passenger's Jones Act claim has suggested that punitive damages or loss of consortium should be unavailable to passengers under the Act. Moreover, in and of itself, the dearth of Jones Act cases brought by passengers is strong evidence that not only have general maritime principles been preserved, but they remain the primary basis for such claims.

With no explicit direction from Congress and no case law applying the passenger provision, it is instructive to look more broadly to "more than a dozen cases [in which] the Supreme Court has affirmed that the Jones Act did not take anything from seamen." Robertson, *supra*, 485 n.147 (citing, *e.g.*, *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942) ("[The Jones Act] is to be liberally construed to carry out its full purpose, which was to enlarge admiralty's protection to its

---

[15] *See also Sepulveda Ramirez v. Hosp. Damas, Inc.*, 2015 WL 1323177, at *3 (P.R. Cir. 2015) (a decision from Puerto Rico's Court of Appeals analyzing the legality of a cruise line's forum selection clause).

wards.")).  And if Congress did not intend to take anything away from seamen in 1920, it is difficult to conceive that Congress sought to shrink passengers' common law recovery rights in 2006.

Almars takes a different tack.  Rather than arguing that the Act's passenger provision prohibits punitive damages or loss of consortium, Defendant insists that recovery under the Jones Act *generally* is limited to pecuniary loss, and thus passengers must be so limited as well. Defs.' Mot. 14–15.  In support, Almars cites a conglomeration of cases, mostly by seamen, involving common law claims and Jones Act claims, all decided before *Townsend* and before the 2006 Jones Act amendment.  Assuming for the moment that Almars is right, and that the Act limits recovery to pecuniary loss for passengers and seamen alike, it does not necessarily follow that the same limitations would apply to the Morgans' common law claims, because nothing in the text of the Jones Act signals that Congress intended to displace passengers' pre-existing common law right to those damages in general maritime law negligence cases. *See Townsend*, 557 U.S. at 422 ("We assume that Congress is aware of existing law when it passes legislation, and the available history suggests that punitive damages were an established part of the maritime law in 1920.") (citing *Miles*, 498 U.S. at 32).

Furthermore, when viewed from a historical perspective, Defendant's initial premise—that a passenger can recover only pecuniary damages in a Jones Act claim—is itself on unstable footing. The Jones Act includes no general limit on damages.  Rather, it limits damages for seamen by reference to FELA. *See* § 30104 (incorporating the "[l]aws of the United States regulating recovery for personal injury . . . to a railway employee"—*i.e.*, FELA).  When Congress originally passed the Jones Act, the Supreme Court had already interpreted FELA to provide only pecuniary damages. *See Michigan Cent. R. Co. v. Vreeland*, 227 U.S. 59, 74 (1913).  Citing *Vreeland*, *Miles* later held that, since Congress "incorporat[ed] FELA unaltered into the Jones Act," Congress must have intended to impose the same limitations on seamen's recovery under the Act. 498 U.S. at 32.  But

only the Jones Act's provision governing seamen incorporates FELA; the passenger provision does not. Seamen are of course employees, and FELA is a statute rooted in the employer-employee relationship. I can find no case, and Almars points to none, explaining why the passenger provision of the Jones act should also be limited by FELA when passengers are by definition not employees.

With *Townsend*'s guidance, I find that the correct answer in this case is even more straightforward than in Mr. Townsend's. Given *Townsend*'s holding that seamen may recover non-pecuniary damages under general maritime law, even in the face of Jones Act provisions explicitly limiting their recovery to pecuniary damages, it becomes all the more clear that non-pecuniary damages should be available to passengers, to whom the limitations of FELA have no logical applicability.

In conclusion, I hold that the Morgans may seek punitive damages and loss of consortium, because that recovery has historically been available and awarded in common law negligence and products actions, and because nothing in *Miles* or the Jones Act eliminates that availability. *See Townsend*, 557 U.S. at 407; *Lobegeiger v. Celebrity Cruises, Inc.*, 2011 WL 3703329, at *6 (S.D. Fla. 2011) ("[*Townsend*] indicates punitive damages are available as damages in all actions under general maritime law unless specifically limited by Congress. . . . Here, like in [*Townsend*], Congress has not enacted any legislation to limit a passenger's right to recover punitive damages in a personal injury action under general maritime law."); *Barrette*, 2011 WL 3516061, at *4 (applying *Townsend* in an unseaworthiness claim by a seaman and his spouse and holding that "loss of consortium remains available" to the spouse).

2. Supplementation with State Law Remedies

The result I reach here is consistent with a separate body of law, not cited by the parties, emanating from a case in the Third Circuit, *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 214 (1996). In *Calhoun*, the Supreme Court held that where "no federal statute specifies the

21

appropriate relief," state remedies remained applicable and had not been displaced by a corresponding federal maritime cause of action. *Id.* at 202.  Natalie Calhoun was a child who died in a jet ski accident close to shore.  Her parents brought a products liability wrongful death action based in federal maritime jurisdiction but invoking Pennsylvania's tort law, including its right to loss of consortium and punitive damages.  Although *Calhoun* involved the death of a non-seafarer, and this case a non-fatal injury, *Calhoun*'s discussion of federal maritime law is useful here.

At the outset, the Court noted that the exercise of admiralty jurisdiction "does not result in automatic displacement of state law." 516 U.S. at 206.  *Calhoun* explained that, although the "federal cast of admiralty law" requires state law to yield when it would *intrude* into a "comprehensive" federal recovery regime, state law nevertheless retains a "wide scope" in maritime law. *Id.* at 210 n.8, 215; *see Pritchett v. Kimberling Cove, Inc.*, 568 F.2d 570, 575 n.6 (8th Cir. 1978) ("[A]dmiralty courts may apply state law . . . when the federal law of admiralty is incomplete."); *Dahl*, 2001 WL 740472, at *3 ("[B]ecause there is not much case law interpreting [the Jones Act] and its negligence standard, the Court will apply Iowa case law in determining whether [plaintiff] makes out a prima facie case of negligence . . . .").

The line between permissible and impermissible state regulation in admiralty cases is not "readily discernible," the *Calhoun* Court acknowledged. 516 U.S. at 210 n.8.  But in choosing to limit or allow concurrent application of state law, the Supreme Court's efforts toward uniformity have historically "centered on the extension of relief, not on the contraction of remedies." *See id.* at 212–13 (citing *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 387 (1970).  Specifically, "a State's remedial scheme might be more generous than federal law but nevertheless could apply because Congress indicated no concern about a disparity between adequate federal benefits and *superior* state benefits." *Id.* at 215 (citing *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715 (1980)) (emphasis in original).  That a dispute is "local," in that it will not interfere with international or

interstate relations, weighs in favor of the availability of state tort law. *Id.* at 207; *accord Wheelings v. Seatrade Groningen*, 516 F. Supp. 2d 488, 497 (E.D. Pa. 2007) ("State law may supplement maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with federal maritime law.").

Significantly, because *Calhoun* was remanded to the district court and appealed again, we have the benefit of the Third Circuit's own interpretation of *Calhoun*:

> [T]he thrust of *[Calhoun]* is to argue that considerations of uniformity in federal maritime wrongful death action require only that standards of *liability* be exclusively determined by federal maritime law and that, once such liability has been shown, there is no antagonism to such a policy in supplementing federal remedies with those available under otherwise applicable state statutes.

216 F.3d 338, 351 (3d Cir. 2000) (citing with approval *O'Hara v. Celebrity Cruises, Inc.*, 979 F.Supp. 254, 256 (S.D.N.Y.1997); *accord Gateway Clipper, Inc. v. Hill*, 2007 WL 2692248, at *8 (W.D. Pa. 2007) (under *Calhoun*, a party's liability is governed by substantive maritime law but damages may be sought under state law).[16]

With this guidance from the Supreme Court and Third Circuit, I conclude that available state law remedies are properly considered in deciding the proper measure of damages. Ms. Morgan's personal injury negligence action is well established in general maritime law. And her injury was certainly local—the accident occurred on a river in Maryland while on a day trip in a friend's boat. The Jones Act provisions discussed above are far from comprehensive and do not specify the remedies available. Therefore, under *Calhoun*, although federal law controls liability, there would be no prohibition against supplementing federal law with available state remedies. *See* 516 U.S. at 215–16; *see also In re Plaquemine Towing Corp.*, 190 F. Supp. 2d 889, 893 (M.D. La. 2002).

E.   Ms. Morgan's Punitive Damages Claim

Having held that punitive damages are recoverable to Ms. Morgan under general maritime

---

[16] The Third Circuit has long held that state law remedies can supplement the remedies created by federal maritime law. *See Dugas v. Nat'l Aircraft*, 438 F.2d 1386 (3d Cir. 1971).

law, I next determine whether the record contains sufficient evidence for her punitive damages claim to survive summary judgment. Punitive damages may be awarded under general maritime law where the defendant's behavior is willful, wanton, or outrageous. *Townsend*, 557 U.S. at 409. "Outrageous" behavior includes "gross negligence," and "reckless indifference to the rights of others." *Exxon Shipping*, 554 U.S. at 493 (citing Restatement (Second) of Torts § 908(2)). Defendant contends that Ms. Morgan's claim for punitive damages must be dismissed because "there is no evidence that Defendant knew, or should have known, of any alleged defect in the Subject Vessel, and there is no evidence that Defendant received any recall notices from the manufacturer . . . ." Def.'s Mot. 16. But this position ignores evidence in the record from which a jury could determine that Almars did know of the defects, either from having been sent one or both of the safety recall letters or from its in-person interaction with the Bentley sales representative who delivered the ball guards. Thus this question, like so many in this case, will come down to whether a jury believes Mr. Marinelli's testimony that Almars did not receive either letter, and knew nothing of the defective hinge or ball guard. If a jury does not find his testimony credible, and concludes that Almars knew of the defect, then the jury could reasonably conclude that Almars's failure to cure the defect by installing block guards or warning its customers amounted to gross negligence or reckless indifference. The claim for punitive damages therefore survives.

## V. Conclusion

Defendant's Motion is granted as to Mr. Morgan's NIED claim, and is otherwise denied. Plaintiffs' Motion is granted as to the "defective" and "unreasonably dangerous" elements of the strict liability claim, as specified above, and denied on all other grounds.

s/Gerald  Austin McHugh_____
Gerald Austin McHugh
United States District Judge
